The plaintiff introduced a deed of trust from J. R. Crapo and William Elliott Gonzalles and wife, dated 10 February, 1891, to Duff Merrick, trustees, made to secure to the plaintiff two notes, one for $2,000 and one for $10,600.
N. A. Penland, the plaintiff, testified that there had been default in payments required to be made by the deed of trust, and that he had had the land described in the deed of trust duly advertised by Duff Merrick, trustees, for sale on the ________ day of ___________, 1891; that on the day of the proposed sale the defendant Crapo said to him that (609) if he would postpone the sale for thirty days he would pay to him, Penland, $280, a sum due to him from Crapo on other debts not secured by the deed of trust. He agreed with Crapo that if he, Crapo, would pay him these other debts he would postpone the sale for thirty days; that the sale at this time was being cried by the auctioneer, who, when this proposition was made by Crapo, stopped crying the sale until Crapo could go to the bank to get the money and came back without it, saying that he could not get the money, but he had a friend, the defendant Willet, who would secure the $280 to him, Penland, at the Battery Park Bank; that he then went to the Battery Park Bank, a few yards away, when Crapo and Willet came into the bank. Willet had a check or certificate of deposit of $1,000 on a bank at Beaufort, S. c., and he indorsed it and handed it at his Penland's, direction to Mr. James P. Sawyer, the president of the Battery Park Bank, who was to hold the same for the security of the $280 until Willet could get $280 from the bank in Beaufort, S.C., and pay it into the Battery Park Bank for him, Penland, which he was to do at once. He, Penland, did then postpone the sale as agreed; that after this the defendant Willet asked to let him, Willet, take up the certified check or certificate of deposit and let him put $300 in the bank to be held in the place of it, and he refused, but that afterwards $300 was left in the bank to be held in same way check or certificate was held; afterwards Willet wanted him to release some lots. He refused to release them unless he would pay him, Penland, $80 per lot as required by the deed of trust; Willet, several days afterwards, said he was to have from Crapo several lots for the $280; that he knew nothing about any arrangement made between Crapo and Willet about the $280; that he considered the transaction as one securing the payment to him of (610) $280 for postponing the sale, or he would not have postponed it.
Duff Merrick was introduced by the plaintiffs and testified that he was the attorney for all the parties in drawing the deed of trust; he *Page 381 
advertised the land as required by the deed of trust or mortgage, and was about to sell; Crapo said he had a friend, Captain Willet, the defendant, who would put up the $280 to pay Penland to postpone the sale for thirty days; the auctioneer was he thinks crying the sale, and Penland and Willet came back and said they had arranged the matter, and sale was stopped. Since this suit was brought $300 was paid into the bank in place of the $1,000 certificates; the defendant Battery Park Bank had the certificate at the commencement of this suit. He thinks he drew some deeds conveying some lots to Willet on the day after sale was postponed, but that Penland knew nothing about it.
James P. Sawyer was introduced as a witness by the plaintiffs and testified: "He is president of the Battery Park Bank and was such at the time of the transactions spoken of by Mr. Penland. Willet and Crapo came to the bank and said Willet wanted to pay Penland $280 and Willet began to draw a check, but did not finish it. He left with the bank on deposit a certificate of deposit of the Bank of Beaufort, S.C. of $1,000, and indorsed it, to be held by the bank as security to Penland for $280. In a few days after this Willet came in and wanted the certificate of deposit, saying the matter had fallen through. He, Sawyer, informed him that he could not give up the certificate unless Penland agreed to it. Penland refused to agree to it; after that W. W. Jones, Esq., attorney for Mr. Willet, deposited $300 in the bank in the place of the certificate to him. This was done after the suit was brought."
The defendant J. R. Crapo testified as follows: "Willet deposited $280 in the Battery Park Bank to pay Penland and then tore up the check, and then said to him, Crapo, in the presence of Sawyer, (611) Penland and Rankin, that he was drawing the check to pay for four lots. He had sold to Gonzalles; that he, Crapo, had told Willet he could buy four lots for $280, and he said he would take them and went down to the bank and deposited $280 to pay for the lots; that he, Crapo, introduced Gonzalles to Willet the day before; he knew Willet for several years, but had no business dealings with him. Penland agreed before the deposit was made, when he got $280, in Moore Merrick's office. Merrick was there, but does not know that he was present, near enough to hear it; that the company, Crapo and Gonzalles, owed Sawyer $150, for which Penland was bound, and he, Crapo, owed some other debts, but did not know how much. Penland said he would sell by the trustees unless he got $280 in cash. Gonzalles had offered to sell all his interest to Willet and Willet agreed to buy on the morning before the sale. Gonzalles backed out. He sold out to Gonzalles that day. Gonzalles agreed to sell the four lots. He asked Penland before. *Page 382 
he went to see Willet that he would release the lots if he got $280. This may have been on the streets."
The defendants Willet testified: "He did not know Gonzalles, but had seen Crapo. Crapo came to him on the day of sale by trustees, Merrick, and said $280 was wanted to complete the trade and wanted to know if he, Willet, would buy four lots for $280, and he, Willet, agreed to pay $280 for four lots. He wrote this down at the time. Crapo told him they would be released by Penland. Crapo came back and said Gonzalles refused to sell to him, but they wanted the $280. He went to the bank to make his check to be held till the deeds were made to him for the four lots. He started to write the check to Merrick, but tore it up. Penland then came in and said he wanted to know (612) where his money would be. He, Willet, told him there in the bank. He, Willet, then gave a certified check for $1,000 to a gentleman to secure the $280. Never indorsed by him. About one week afterwards he asked Penland for his deeds and he, Penland, refused to make them. He left the check for no other purpose than to pay for the lots. As he went out of the bank after depositing the check he told Penland he did not want to stay here and wanted his deeds and that Penland said they would be ready tomorrow. He never got the deeds. Crapo told him, to induce him to take the lots, that there would be a profit of $385 on the four lots."
Plaintiff then introduced J. E. Ranking, who testified as follows: "I am cashier of the Battery Park Bank and was in the bank at the time the check was deposited by Willet. The substance of the talk between the parties was that there was a sale of some land and that $280 was needed to stop it, and Willet was to became paymaster to Penland for that amount. Willet deposited a certified check on the Bank of Beaufort, S.C., for $1000 to secure the $280 to Penland. I did not hear all that was said. Did not hear what the consideration of Willet was. The check was not indorsed; it was not to be collected."
The plaintiff N. A. Penland, being recalled, testified: "I did not tell Gonzalles or Crops at any place that I would release the four lots for $280. I told them that I would release the four lots if they would pay me $80 per lot as agreed in deed of trust. Don't remember any conversation with Willet about deed. Don't remember hearing Willet say in the bank anything about the $280 being for four lots."
Mr. Merrick, being recalled by plaintiffs, testified: "I never heard Penland say anything about the release of four lots. I heard Willet say something about $280 being for four lots afterwards."
This was all the evidence offered in the case.
(613) The court, upon the conclusion of the introduction of the evidence, being of opinion in favor of defendants and having so *Page 383 
expressed its opinion, the plaintiffs submitted to a judgment of nonsuit and appealed.
The judgment of nonsuit must be set aside. Viewing the evidence in the light most favorable to the plaintiffs, as we are required to do in this appeal, we find in it what seems to us amply sufficient to sustain his demand that the check or certificate of deposit placed by the defendant Crapo in the Battery Park Bank at plaintiff's direction shall be condemned to the payment of the sum which that defendant had promised to pay him, as he alleges.
Error.
(614)